**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | DOCKET NO. 3:21-CR-00440-M |
| | § | **EX PARTE AND UNDER SEAL** |
| JOHN GRISHAM | § | |
| ROB WILBURN | § | |

---

**DEFENDANTS' SEALED, EX PARTE MOTION FOR AN EVIDENTIARY HEARING**
**AND DISCOVERY**

---

# TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………...………………i

TABLE OF AUTHORITIES……………………………………………………….……..…ii

I.     Introduction and Summary of Motion……………………………………….……...…1

II.    Background……………………………………………………………….……...…2

    A. Involved Parties…………………………………………………………….……...…3

    B. The Attorney-Client Relationships ……………………………………….…..….…3

    C. Joint Defense Agreement…………………………………………….…………...…5

    D. Courville's Cooperation and Known Disclosures of Privileged Information……...….…6

    E. Courville's Continued Participation in the JDA After Signing Agreement
      as an FBI Confidential Human Source……………………………………………...…14

    F. Timeline of Disclosure of Courville's Status as an FBI CHS…………...……...…19

III.    Argument and Authorities……………………………………………………...…19

    A. Law Governing Attorney-Client and Work Product Protections, Joint
      Defense Agreements and Invasions of the Defense Camp by the Prosecution…......…19

    B. Argument……………………………………………………………………22

    C. Request for Evidentiary Hearing and Discovery……………………..…..….…......…24

IV.    Conclusion…………………………………………………………...….…...…26

# TABLE OF AUTHORITIES

**CASES**

*Ayers v. Hudson*, 623 F.3d 301, 311 (6th Cir. 2010) .................................................................. 25

*Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) ................................... 21

*Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21-22 (D. Mass. 2017) ........ 20

*FDIC v. Cheng*, Civil No. 3:90-CV-0353-H (Consolidated with CA-3:91-0076-H; CA-3:91-0333-H; CA-3:91-1677-H; CA-3:91-1678-H), 1992 U.S. Dist. LEXIS 20824, at *6 (N.D. Tex. Dec. 2, 1992) ................................................................................................................................ 20

*Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) ............................... 21

*Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 440 (E.D. Tex. 2003) ............................ 20

*Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) ....................................................... 25

*Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745 (1963) .................................................................. 25

*United States v. Brink*, 39 F.3d 419, 422–24 (3d Cir. 1994) ........................................................ 25

*United States v. Esformes*, No. 16-20549-Cr, 2018 U.S. Dist. LEXIS 193190, at *35 (S.D. Fla. Nov. 13, 2018) ............................................................................................................................ 21

*United States v. Hsia*, 81 F. Supp. 2d 7, 16 (D.D.C. 2000) ................................................... 20, 21

*United States v. Levy*, No. 10-60159-CR-ZLOCH, 2010 U.S. Dist. LEXIS 68796, at *9 (S.D. Fla. June 22, 2010) ............................................................................................................................ 22

*United States v. Posner*, 637 F. Supp. 456, 459-60 (S.D. Fla. 1986) .......................................... 22

*United States v. Robinson*, 121 F.3d 971 (5th Cir. 1997). ........................................................... 20

*United States v. Terzado-Madruga*, 897 F.2d 1099, 1110 (11th Cir. 1990) ................................ 21

*United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) ........................................................... 25

*United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970) .............................................................. 21

*Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) ................................ 22

COME NOW defendants John Grisham (01) (hereafter "Grisham") and Rob Wilburn (02) (hereafter "Wilburn" or collectively the "defendants") and submit their *Ex Parte*, Sealed Joint Motion seeking an evidentiary hearing and concomitant discovery and in support thereof would respectfully show the Court as follows:

## I. INTRODUCTION AND SUMMARY OF MOTION

Defendants Wilburn, Grisham and non-party Courville have been parties to a joint defense agreement ("JDA") since late 2019. The original JDA included these three business partners plus Wilburn and Grisham's New Jersey attorneys and Courville's counsel, Barrett Howell. Subsequently, when Wilburn retained Brian Poe and Grisham retained Daniel Hagood and Alexandra Hunt in the summer of 2020, the parties all reconfirmed the existence of the extant JDA and recommitted to participation. At all times, up until January 26, 2023, Wilburn, Poe, Grisham, Hagood, Hunt, Courville, Howell, and another lawyer from Howell's firm, Ryan Meyer operated as a joint defense team, sharing information, meeting and having conference calls regularly, and strategizing a defense to the allegations that ultimately formed the basis of the instant indictment.

The prosecution team had knowledge of the existence of the JDA and that Courville and counsel were participants in it at least as early as August 5, 2020. Even so, the FBI signed Courville up as a Confidential Human Source on February 11, 2021. While operating as a CHS for the government and using codename "Silver," Courville wore a wire and had multiple telephone calls and an in-person meeting with now co-defendant Ric Speights during which Courville discussed and elicited attorney-client privileged information with and from Speights. In addition, Courville and his counsel continued to participate in the JDA with Wilburn, Grisham and counsel. He and his counsel participated in multiple JDA meetings and strategy sessions and calls, sharing reams

of confidential and privileged information, advocating positions that would benefit the government and at times urging Wilburn and Grisham to plead guilty.

The government has long been aware of the substantive and significant involvement in this case of attorneys who advised Courville, Wilburn, and Grisham regarding the structure of the sale of their company and its operations post-sale. The advice that was rendered by counsel and the testimony that those lawyers could potentially provide in defense of the charges have been of interest to the government since it first began investigating this case. However, in spite of the involvement of a Filter Team in evaluating the materials obtained as a result of the execution of the search warrant in this case, the prosecution team elected not to involve the Filter Team in its management of Courville – a CHS who was inside the defense camp and participating substantively as a member of a joint defense agreement – until late January of 2023.

Wilburn and Grisham seek discovery and an evidentiary hearing in order to determine the use to which the government has put the attorney-client privileged information that the defense has recently learned was disclosed. In addition, the defendants seek to determine whether Courville and counsel have provided additional attorney-client and/or JDA-protected information to the government as a result of Courville and counsel's continued participation in the JDA, and if so to what use that information has been put by the government.

## II.    BACKGROUND

### A.    Involved Parties

Defendants Grisham and Wilburn and non-party, Jim Courville were equal co-owners of the Trinity Clinical Laboratories, LLC ("TCL"), a genetic testing laboratory and the business that is the basis for the charges set forth in the Indictment in this case. In early January of 2018, TCL was on the brink of bankruptcy. At that time, Courville was introduced by Ric Speights to Dr. John

Berberian who was interested in purchasing TCL. Berberian and Speights offered to purchase seventy-five percent of TCL with the idea that TCL would be converted into a high complexity laboratory. Berberian claimed to have a "system" for marketing, billing and compliance operations associated with conducting genetic testing. After consulting with healthcare law specialists, attorney Sean McKenna and attorneys with the Hall Render law firm, TCL and Berberian/Speights elected to forego a formal purchase agreement, and instead moved forward with a "management company" model. Under this model, Berberian and Speights would together form TCLMS, LLC (TCLMS), a management company for TCL. TCL would pay TCLMS 75-80% of all revenue.[1] Other relevant entities for purposes of this motion include JBJB Holdings, LLC (JBJB), an entity owned by Berberian, HSD Consultants, LLC (HSD) also owned by Berberian, and Priority Investments, LLC (Priority), an entity owned by Speights.[2]

In September of 2019, in connection with an investigation by the Department of Justice Healthcare Fraud Strikeforce in Dallas, Texas led by Department of Justice Trial Attorney Carlos Lopez, federal agents executed a search warrant at TCL's offices. The crux of the Northern District of Texas investigation was the allegation that TCL was paying illegal kickbacks to marketers to obtain the genetic test samples for the lab. After execution of the search warrant, TCL ceased operations.[3]

## B. The Attorney-Client Relationships

Attorney Sean McKenna represented TCL beginning on September 28, 2018. Beginning on November 29, 2018, that representation expanded to include JBJB, HSD, and Priority. On

---

[1] Declaration of Brian Poe ("Poe Declaration") at 1-2, attached as Exhibit A.
[2] Sean McKenna Engagement Letters dated December 20, 2018, December 21, 2018, and April 17, 2019 ("McKenna Engagement"), attached collectively as Exhibit B; Hall Render Engagement Letters dated January 2, 2019 and March 12, 2019 ("Hall Render Engagement"), attached collectively as Exhibit C.
[3] Poe Declaration at 2.

December 21, 2018, TCLMS was added to the representation. McKenna represented these companies through April 19, 2019 for the purpose of rendering advice regarding operational, regulatory, and compliance matters.[4]  The law firm of Hall Render began representing TCL on October 29, 2018. Entities JBJB, HSD, and Priority were added to that representation on January 2, 2019. That representation also was for the purpose of rendering advice regarding operational, regulatory, and compliance matters.[5]

On information and belief, following execution of the Northern District of Texas search warrant, Barrett Howell of Katten Muchin Rosenman LLP (Katten) was initially retained to represent TCL but then was retained by Barrett Howell as his individual counsel in September of 2019.[6] TCL subsequently retained Paul Werner of Buttaci Leardi & Werner as its corporate counsel on or about December 30, 2019.[7] Howell and Ryan Meyer, also of Katten, continue to represent Courville today and Werner continues to represent TCL. Initially, due to a parallel investigation by the United States Attorney's Office in the District of New Jersey into a marketer who submitted genetic test samples to TCL, Grisham was represented individually by New Jersey attorney Eric Moran, and Wilburn was represented individually by New Jersey attorney Jane Yoon.[8]

On May 28, 2020, Howell contacted attorney Brian Poe to inquire about the possibility of Wilburn retaining Poe to represent him in connection with the Texas investigation. In that first call, Howell indicated to Poe that he (Howell) had initially been retained as TCL's corporate

---

[4] *See generally*, McKenna Engagement.
[5] *See generally*, Hall Render Engagement.
[6] Poe Declaration at 2.
[7] *Id*.
[8] *Id*.

counsel but that he had transitioned to representing only Courville.[9] After initial meetings, Wilburn elected to retain Poe and that representation was formalized on June 22, 2020.[10] On June 29, 2020, Poe called AUSA Lopez to advise him that he would be representing Wilburn going forward.[11] Grisham has been represented by Daniel Hagood and Alexandra Hunt since July 6, 2020.[12] Hagood called Lopez on or about August 5, 2020 to inform Lopez that he was representing Grisham.

### C. Joint Defense Agreement

Courville represented by Howell, Grisham then represented by Moran, and Wilburn then represented by Yoon initially entered into an oral JDA at the commencement of their representation.[13] In his May 28, 2020 introductory phone call to Poe, Howell informed Poe of the existence of the JDA involving Courville, Grisham, and Wilburn and counsel.[14] Then, in Poe's initial meeting with Wilburn on May 29, 2020, Wilburn also confirmed to Poe the existence of the JDA and his participation in it.[15] During his initial August 5, 2020 call, Hagood informed Lopez that he and his client were party to a JDA with Courville and counsel and Wilburn and counsel and sought and received Lopez's permission to share the substance of the call with the parties to the JDA.[16] In communications among the parties to the agreement, counsel – including Howell – made ongoing references to the existence of the JDA.[17] Poe attended his first Joint Defense meeting

---

[9] *Id.*

[10] *Id.* at 3.

[11] *Id.*

[12] Declaration of Daniel Hagood (Hagood Declaration) at 2, attached as Exhibit D

[13] Hagood Declaration at 1-2.

[14] Poe Declaration at 3.

[15] *Id.*

[16] *Id.*; Hagood Email dated August 5, 2020 at 1 ("Hagood 08/05/2020 Email), attached as Exhibit E. The subject line of that email is "Attorney-client/Joint defense/common interest/attorney work product privileged and confidential communication," it was addressed to Poe, Hunt, Howell, Meyer, Werner, Segedy, and another law firm staff member. The email discusses the substance of Hagood's call with with Lopez.

[17] *See, e.g.* Notes of Alexandra Hunt dated July 27, 2021 ("Hunt 07/27/21 Notes"), attached as Exhibit F (containing heading "Post with Joint Defense Counsel and Grisham, Courville"); Memorandum to File of Alexandra Hunt dated June 23, 2021 ("Hunt 06/23/21 memo") at 1, attached as Exhibit G (noting the following: "[Hagood] mentioned the email that all JDA counsel received earlier today and asked [Howell] what his thoughts were"); Email from Howell

at Katten's offices on July 23, 2020 and orally confirmed that he and his client would continue to participate in the JDA.[18] After Poe and Hagood began representing Wilburn and Grisham -- in addition to multiple joint defense emails and telephone conferences – the parties and counsel participated in multiple joint defense meetings, either in-person or on Zoom. In addition to the initial meeting referenced, above, further joint defense meetings took place on the following dates prior to return of an indictment: September 24, 2020,[19] October 16, 2020,[20] March 29, 2021, March 30, 2021,[21] June 23, 2021,[22] June 28, 2021,[23] August 8, 2021.[24] The parties participated in an another joint defense meeting on October 11, 2021 following the return of an indictment on September 15, 2021 against Grisham and Wilburn, but not Courville.[25]

### D. Courville's Cooperation and Known Disclosures of Privileged Information

Courville's cooperation commenced in the spring of 2020. Beginning in April of 2020, unbeknownst at the time to Grisham or Wilburn or their New Jersey or Texas counsel, he engaged in three proffer sessions with the government. In addition to Courville and Howell, prosecutor Carlos Lopez, Special Agent Jason Seth of HHS-OIG and Special Agent Jacob Karn of VA-OIG

---

to Poe dated August 8, 2021, attached as Exhibit H (Howell emails Poe, "[a] ppreciate you coordinating today's joint defense meeting. Would you mind sending me a copy of the [Zoom] recording at your earliest convenience?").

[18] Attendees included Wilburn, represented by Poe; Grisham represented by Dan Hagood and Alexandra Hunt; and Barrett Howell and Ryan Meyer. Courville was not in attendance as his mother was in the hospital. Poe Declaration at 3.

[19] Attendees included Poe, Hagood, Howell and three attorneys from a civil firm invited by Howell. Poe Declaration at 4.

[20] Attendees included Howell, Hagood, Hunt, and Poe. Poe Declaration at 5.

[21] Attendees included Hagood, Hunt, and Private Investigator Matt Segedy. Howell and Poe each attended for portions of this meeting which was for the purpose of preparing Grisham for his proffer with the government. Poe Declaration at 9; Notes of Alexandra Hunt dated March 29, 2021 ("Hunt 03/29/21 Notes"), attached as Exhibit I

[22] Attendees included Hagood, Segedy, Howell and Aparna Sharma. The first line of the Memorandum references "all JDA counsel." Hunt 06/23/21 Memo.

[23] In-person attendees included Werner, Courville, Howell, Meyer, Grisham, Hunt, and Poe. Wilburn was conferenced in via phone. Poe Declaration; Alexandra Hunt dated June 28, 2021 ("Hunt 06/28/21 Notes"), attached as Exhibit J.

[24] This meeting was held via Zoom and was recorded. Attendees included Courville, Howell, Grisham, Hagood, Wilburn, and Poe. Poe Declaration at 10; Zoom Transcript, attached as Exhibit K.

[25] Attendees included Werner, Courville, Howell, Meyer, Grisham, Hunt, Wilburn, Poe, and Segedy. Poe Declaration at 11; Notes of Alexandra Hunt dated October 11, 2021 ("Hunt 10/11/21 Notes"), attached as Exhibit L.

were in attendance at the first proffer session on April 30, 2020.[26] The Report of Interview (ROI) contains the following verbiage: "Courville stated his attorneys, Mr. Barrett and Mr. Ryan, do not have a Joint Defense Agreement, verbally or in writing, with the New Jersey attorneys representing the other two (2) owners of TCL identified as John Grisham and Rob Wilburn."[27] As discussed *supra*, this representation is contrary to the representations made by Howell to Poe and Hagood in his initial discussions with them, and contrary to what Moran told Hagood in the early summer of 2020.[28]

The April 30, 2020 ROI, in a section entitled "TIMELINE OF COMPLIANCE MEETINGS" reflects that in response to questioning, Courville recalled attending three separate "compliance meetings" involving attorneys McKenna, Dugger, and/or Puff, at least two of which were held at attorneys' offices.[29] The ROI reflects that "Courville was again asked not to provide specifics about what was discussed between attorneys and others to avoid any claim of attorney client or common interests privilege," but then in the section immediately thereafter, entitled "DISCUSSION REGARDING LEGALITY," the ROI reflects that Courville told the prosecution team that he "recalled many discussions [in the compliance meetings] concerning rules, regulations, and complaints and how this could affect TCL" and that "TCL owners and associates constantly discussed legal and regulatory issues among themselves *and with retained attorney's* (sic) including the kickback statute, marketing, and the 70/30 regulation that prevents laboratories from referencing out more than 30% of laboratory work."[30]

---

[26] Report of April 30, 2020 Interview of James Courville ("04/30/2020 ROI") at 1, attached as Exhibit M.
[27] *Id.* at 1.
[28] Poe Declaration at 2; Hagood Declaration at 1.
[29] *Id.* at 9.
[30] *Id.*

Courville was interviewed again by the government on May 20, 2020. Attendees included Courville and his attorneys Howell and Meyer, Sergeant Doug Wood with the Texas Office of the Attorney General – Medicaid Fraud Control Unit (OAG-MFCU), SA Jason Seth with HHS-OIG, and Lopez.[31] In a section entitled "ANTI-KICKBACK STATUTE AND COMPLIANCE MEETINGS" in the ROI for this meeting it states that Courville told the prosecution team that "[t]he in person "compliance meetings" were a more limited group of participants selected by Berberian, but they always included Speights and the owners of TCL (John Grisham, Wilburn, and Courville). Other participants regularly invited included attorneys…"[32] Regarding discussions at these compliance meetings, the ROI noted:

> Courville could not recall persons in either meeting openly discussing a specific rules or regulations (sic) that were being violated, but general discussions took place related to health care fraud, anti-kickback, and limitations on referring testing to outside laboratories. Courville stated when attorneys provided guidance it appeared they were providing advice that followed the rules, regulations, and laws established by private and public insurance. Courville stated the actions taken did not always follow the advice of counsel or what was written in contracts rather it took the course needed to secure an approved patient, conduct a genetic test, and be paid by private of (sic) public insurance including Medicare.[33]

Courville was also questioned during the May 20, 2020 proffer interview regarding his recent communications with JDA participants Grisham and Wilburn. In a section entitled "RECENT CONTACT WITH TCL PARTNERS AND ASSOCIATES" the ROI reflects that "John Grisham and Courville spoke and John Grisham was blaming Berberian for everything and expressed a desire to speak to persons conducting the investigation to explain his side."[34] Regarding communications with Wilburn, the ROI states that "Courville has only briefly spoke

---

[31] Report of May 20, 2020 Interview of James Courville ("05/20/2020 ROI") at 1, attached as Exhibit N (emphasis added).
[32] *Id.* at 7-8.
[33] *Id.*
[34] *Id.* at 11.

(sic) to Wilburn who also mentioned he was considering speaking to investigators through a proffer.[35]

Courville participated in a third proffer session with the government on September 16, 2020.[36] Notably, this proffer session took place *after* Poe and Hagood were retained for Wilburn and Grisham and *after* Howell informed both counsel of the existence of a pre-existing JDA and confirmed their continued participation in that JDA. Moreover, as discussed *supra*, by September 16, 2020, the prosecution team was on notice that both Wilburn and Grisham had new counsel and DOJ Trial Attorney Lopez had been informed of the existence of a JDA and of Courville and counsel's participation in it.[37] Even so, the ROI for this proffer reflects no inquiry or discussion regarding the existence of a JDA nor does it reflect that the participants in the proffer meeting took any measures to prevent the disclosure of privileged information to the trial team.[38]

Attendees at the September 16, 2020 proffer included Courville and his attorneys Howell and Meyer, as well as SA Jason Seth with HHS-OIG, Sergeant Doug Wood, TX-MFCU, and Lopez.[39] During the September 16, 2020 proffer, Courville confirmed his awareness that attorneys McKenna and Dugger "were engaged by TCL and TCLMS."[40] Courville also shared with the prosecution team, the following information regarding alleged communications with counsel for TCL and TCLMS:

> Courville told the government that attorney McKenna "recommended the use of an encrypted application to hide communications among TCL and TCLMS" and that McKenna allegedly stated that "there are somethings (sic) you say or do that there does not (sic) to be a record of."[41]

---

[35] *Id.*
[36] Report of September 16, 2020 Interview of James Courville ("09/16/2020 ROI"), attached as Exhibit O.
[37] *See* discussion of representation, *supra* and Hagood Declaration at 2.
[38] *See generally*, 09/16/2020 ROI.
[39] *Id.* at 1.
[40] *Id.* at 5.
[41] *Id.*

Courville also shared with the government that McKenna allegedly commented after seeing the business structure "something to that effect of 'this is a great business, I see myself as an investor…maybe as an in-house counsel' implying that McKenna should receive further compensation or an internal position because of the money that would be made." The ROI also reflects that "Courville stated McKenna came up to him and said, 'congrats on [the] $100 million lab.'"[42]

The ROI also reflects that "McKenna told Courville 'I am not talking to those attorneys or Berberian because they are crooks.'"[43]

Importantly, during the September 16, 2020 proffer, according to the ROI, Courville allegedly volunteered to the prosecution team that "he do not believe (sic) the FMV material prepared by VMG Health was considered privileged."[44] As background, in November 2018, TCL attorney McKenna retained VMG Health to engage conduct a fair market value analysis (FMV) of TCL for the purpose of facilitating the purchase of TCL by Berberian and Speights. The named "client" on the VMG health Valuation Engagement Agreement is "Law Office of Sean McKenna, PLLC" and the email to which the agreement is attached has as its subject matter "ATTORNEY CLIENT PRIVILEGED AND CONFIDENTIAL COMMUNICATION."[45]

Notwithstanding the fact that both Howell and Courville knew that the FMV analysis was commissioned by TCL's counsel and was privileged, the ROI further states that "Courville confirmed that TCL's attorneys, Sean McKenna (McKenna), and Keith Dugger had never provide[d] any legal advises (sic) in FMV or any material related to VMG Health's FMV analysis for TCL."[46] With that as preamble, the prosecution team then elicited from Courville reams of information regarding the FMV analysis including his assessment regarding the reasons for the

---

[42] *Id.* at 6.
[43] *Id.*
[44] *Id.* at 1.
[45] *See* Email from Keith Dugger, dated May 8, 2019 and attachment entitled "Valuation Engagement Agreement, dated November 26, 2018 ("FMV Documents"), attached collectively as Exhibit P.
[46] 09/16/2020 ROI at 1.

initiation of the FMV analysis, and an assertion that the decision "was solely a business decision and not a legal one as well as a discussion of the information that was provided by marketers to VMG for the purpose of conducting the analysis. According to the ROI from Courville's September 16, 2020 proffer, "Courville confirmed Speights, Wilburn, Berberian, Keith Dugger (attorney) and himself saw and knew that the cost per sample or cost per patients was being billed by marketers; and not a hourly rate or flat fee rate while working on the FMV project." Nearly half of the ROI for this meeting is devoted to memorializing Courville's discussion of the privileged FMV analysis.[47]

On October 5, 2020 in a social setting, Howell inadvertently disclosed to Hagood that Courville had by that point engaged in three proffer sessions with the government without disclosing that fact to Wilburn, Grisham, Hagood, Hunt, or Poe.[48] During a subsequent call with Poe, Howell claimed that he had not disclosed the proffers to the other JDA participants because Lopez had threatened Courville and Howell not to disclose the fact of Courville's cooperation.[49] Howell confirmed to Poe Courville's intent to remain in the JDA, however.[50] Ultimately, in an effort to stave off indictment, both Wilburn and Grisham proffered as well – Wilburn on September 25, 2020 and Grisham on March 30, 2021.[51] Counsel for Wilburn and Grisham included Howell and Meyer in strategy calls, prep meetings, and emails related to their clients' proffer sessions.[52]

On February 11, 2021, unbeknownst to Wilburn, Grisham, or their counsel, Courville signed an agreement with the FBI to operate as a Confidential Human Source (CHS). He was given

---

[47] *See* 09/16/2020 ROI.
[48] Poe Declaration at 4; Hagood Declaration at 2.
[49] Poe Declaration at 5.
[50] *Id.*
[51] Poe Declaration at 4; Hagood Declaration at 3. *See also* Hagood email dated February 3, 2021 ("Hagood 02/03/21 Email"), attached as Exhibit Q (Noting that Hagood had again advised Lopez of the existence of a JDA among Courville, Wilburn, and Grisham).
[52] Poe Declaration at 9. Hagood Declaration at 2-3.

the code name "Silver."[53] The CHS agreement gave the FBI broad authorization to use a body recorder, transmitter, recording device, closed circuit television, to install a pen register/trap and trace device on Courville's phones.[54] It also granted authorization for "other" monitoring, the details of which were left unspecified.[55] The CHS agreement was "for the purpose of monitoring, viewing, listening to, and/or recording any activity [Courville] may have with Richard Speights and others yet unknown which [Courville] may have on or about 2/11/2021 and continuing thereafter until such time as either [he] revoke[s] [his] permission or the FBI terminates the investigation."[56] As an FBI CHS, Courville/"Silver" made a number of recorded telephone calls to Ric Speights who was and is represented by Attorney Gene Besen. These calls were made on the following dates: February 14, 2021, two calls on April 20, 2021, two calls on April 27, two calls on May 3, 2021. In addition, on April 28, 2021, Courville/Silver had an in-person meeting with Speights during which Courville/Silver was wired with a covert recording device.

During these recorded calls and the recorded meeting, Courville discussed with Speights – and thus disclosed to the government – attorney-client privileged information. A full assessment of those disclosures is in progress[57] by counsel for Wilburn and Grisham, however the following are examples of privileged information purposefully elicited by Courville from Speights regarding attorney meetings and advice rendered by TCL counsel Hall & Render and Sean McKenna:

> SPEIGHTS: "He met with ARK in Dallas with Sean McKenna…I was not in that meeting…Sean came out and said, you know – out of everybody's program, I like theirs the best."[58]

---

[53] CHS Agreement dated February 11, 2021, attached as Exhibit R.
[54] Id.
[55] Id.
[56] Id.
[57] Filter Team Letter dated February 17, 2023 ("Filter Team Letter"), attached as Exhibit S.
[58] February 14, 2021 Call Transcript at 19, attached as Exhibit T.

SPEIGHTS: "They didn't say – well you shouldn't do this or – they said I can do it. As a matter of fact – they wrote the fucking program and the contract – knew exactly what the fuck we were doing."[59]

SPEIGHTS: "Whatever we were doing, as it related to Matt, Hall & Render was approved at every step of the way. I was in multiple meetings with Keith [Dugger] and that chick [Christian Puff], I can't remember her name, multiple times with Matt [Eggan], knowing that she was good. I mean, he was good, and what we were doing was fine. They were signed off on all that."[60]

SPEIGHTS: "[Hall & Render] know everything he [Matt Eggan] was doing. At the end of the day, and Matt even changed a couple of things, they wanted him to change. So everything they wanted, Matt did. So, and we did."[61]

SPEIGHTS: "So—the next morning, Rob, Berberian, and Casey are – met with Sean McKenna laid out their program to Sean and Sean said I like them more than anybody else—the problem is – they weren't doing what they told Sean they were doing."[62]

SPEIGHTS: "Because Sean McKenna and [inaudible] [Hall Render] said – pay the percentage and its okay until we can get fair market value from this company. They signed off on that – and that's fact."[63]

In addition, the following are some examples of JDA-protected communications with Wilburn and Grisham that Courville discussed with Speights – and thus disclosed to the government – that are reflected in the call and meeting recordings:

COURVILLE: "Well – that's what I'm trying to tell you – that's what Barrett is yelling at me about. That's what you've got to talk to your attorney about – is that – if there is a fucking contract that says we paid a percentage, then we paid a percentage. That's – you can go argue that. The problem is – is that there is – Grisham's signing fucking one thing and paying the fuck [Inaudible] way....it's causing Grisham some serious heartburn."[64]

COURVILLE: Oh – Rob [Wilburn] asked me the other day if – he goes – "Do you know if we were paying Chris Lytle." I guess is (sic) attorney asked him that. We were paying Chris Lytle?"[65]

---

[59] *Id.* at 19-20.
[60] April 20, 2021 Call Transcript at 7, attached as Exhibit U.
[61] *Id.* at 9.
[62] Recording 0416.006 at 40:38-40:58 (April 28, 2021 Meeting), attached as Exhibit V.
[63] *Id.* at 42:19-42:35.
[64] Recording 416.003 at 00:16-00:54 (April 28, 2021 Meeting), attached as Exhibit W.
[65] *Id.* at 28:57-30:00.

COURVILLE: "I can't have - you know what I'm saying – like – I almost -- I'm almost in the position -- I've gotta go down with Matt [Eggan], too. If it ever gets that far. And that's another thing I didn't realize -- I found out from Grisham. Grisham was meeting -- Grisham was meeting with all those guys.… Yeah. Grisham – Grisham went by himself with – with the different marketers."[66]

Courville also encouraged Speights to call Wilburn on the phone to ask Wilburn questions designed to elicit inculpatory responses that would be recorded on the wire:

COURVILLE: "Dude – will you do me a favor? Will you call him [Wilburn] real quick and just ask him if there's any fucking other fucking thing signed? Please? Just – [Speights makes a phone call]. Hey, by the way – look at that shit. [Inaudible] all over – Louisiana company. Ask him if he's got that agreement signed because Grisham [inaudible] on an hourly basis. If that's the case, we're – we're fucked."[67]

COURVILLE:  "How often were the distributors paid?"
SPEIGHTS "OH – I –"
COURVILLE:  "Was it once a week?"
SPEIGHTS:  "I have no clue. I wouldn't think that because Rob – did Rob wire – I could find out – I could ask Rob.
COURVILLE:  Ask him. Don't text him. Call him.[68]

### E.  Courville's Continued Participation in the JDA After Signing Agreement as an FBI Confidential Human Source

Even after Courville signed his agreement with the FBI on February 11, 2021 to operate as a Confidential Human Source, Courville and his counsel continued to participate in the JDA with Wilburn and Grisham and their attorneys. Courville and counsel did not withdraw from the JDA; nor did they disclose Courville's CHS status to Wilburn, Grisham, Hagood, Hunt, or Poe. In addition to a significant number of JDA-protected telephone calls and email correspondence Courville and/or counsel participated in at least five JDA meetings after Courville became a CHS.

---

[66] Recording 416.004 at 1:19-1:50 (April 28, 2021 Meeting), attached as Exhibit X.
[67] Recording 416.003 at 32:55-33:48 (April 28, 2021 Meeting).
[68] Recording 416.004 at 5:31-5:44 (April 28, 2021 Meeting).

As discussed *supra*, these five meetings took place on March 29, 2021, June 23, 2021, June 28, 2021, August 8, 2021, and October 11, 2021.

The March 29, 2021 meeting attended by Howell was a lengthy preparatory session for Grisham's proffer that addressed the substance of the allegations against TCL and its principals and set forth action items prior to the proffer session.[69] Hunt's notes from the June 23, 2021 meeting reflect that "JDA counsel" – among them, Howell – discussed an email received from the government, the likelihood of indictment, and the attorneys' concerns regarding the government's negotiating position vis a vis John Grisham. The notes also reflect that Howell stated that he had met with DOJ Trial Attorney Lopez who asked Howell if he could convince Hagood to persuade Grisham to accept a five-year plea deal.[70] Hunt's June 28, 2021 meeting notes reflect that the parties discussed the status of the case and negotiating strategy with the government.[71] In addition, the notes reflect that both Meyer and Howell advocated suing TCL's attorneys, Dugger and McKenna, with Howell advocating that the primary benefit of doing so would be that "it would waive privilege."[72]

The August 8, 2021 meeting took place via Zoom and Poe consensually video recorded that meeting. The transcript of that Zoom call runs to ninety-four pages. During that call, Wilburn, Grisham, Courville and counsel discussed the substance of the government's allegations against TCL and its principals as well as strategy for negotiation and possible defenses to potential charges.[73] Even though by that point, Courville was secretly an FBI CHS, he, Howell and Meyer

---

[69] Hunt 03/29/21 Notes.
[70] Hunt 06/23/21 Notes at 2.
[71] Hunt 06/28/21 Notes.
[72] *Id.* at 3.
[73] *See generally*, Zoom Transcript.

were active participants, repeatedly demanding information about the anticipated defenses to the

anticipated charges:

> COURVILLE: This is Jim. I actually read -- read -- read through it yesterday. I can -- from -- from a client prospective, what I hope to have done on this call today is for us to really roll up our sleeves, because I know from my conversations with Rob and John -- I don't want to speak for them, but quite honestly, I just feel that we're in no better situation than what we were whenever we all were retained, you know, a year-and- a-half ago. And, you know, if we're gonna make this decision to go -- to go fight this, I just hope that we can at least get an understanding of what the defense is going to be, because whatever the messaging that Paul Werner and everyone who did on the reverse proffer, and all those types of -- I mean, not on the reverse proffer, but on the proffer from a corporate perspective, just doesn't seem like our story is resonating with anyone in the government. And I'm just scared that if it's not resonating with them, the next time that we go before judge or a jury, I hope we have something that's going to resonate or at least defend this.[74]

> COURVILLE: I guess where I am, like, I still just don't feel like we're getting there right now with this conversation, but -- and I'll shut up if we could -- if we can answer these questions today if not, but Barrett spent time with me this morning going over what it looks like from a -- you know, if we do go to trial, we do testify, what could possibly be the worst possible case scenario. It's pretty scary. And I just have to -- I just have to have a little bit more security of kind of what this defense looks like. I just don't think I know enough information right now to be able to make a decision of anything right now. I don't know if you guys feel the same way, because unfortunately, I've seen a lot of -- I've seen a lot of -- a lot of good people, bad things have happened to them, and I don't want that to be us.[75]

> COURVILLE: We get indicted, regardless of whether we win or lose, our lives are over with. And now we're here, and so I'm really scared about what's our defense. If we've been unsuccessful for the past two-and-a-half years -- I mean, I gotta be honest, I never thought that in a million years, that after two-and-a-half years that we would be going and sitting in a reverse proffer and we would be told that we're getting fucking 10 years…. And so, obviously, the shit that's been going on -- sorry for – I'm just very passionate about this. Obviously, what's been going on for the past two-and-a-half years hasn't been working at all, so I'm very scared about our defense. That's just where I'm coming from.[76]

> HOWELL: Hagood, you -- you were there when -- when you guys met with -- with McKenna and with Keith. I mean, what do you – what's your – what's your gut on

---

[74] Zoom Transcript at 7.
[75] *Id.* at 39-40.
[76] *Id.* at 53-54.

how strong a reliance on advice of counsel defense can be made if we're putting either of those two guys on the stand?[77]

On September 15, 2021, the grand jury returned an initial indictment against Grisham and Wilburn, but not Courville. Following return of the indictment, on October 11, 2021, the JDA participants – Courville and his attorneys Howell and Meyer, Grisham and Hunt, Wilburn and Poe, as well as TCL attorney Paul Werner and investigator Matt Segedy – met to discuss next steps.[78] Hunt's notes of this meeting reflect that during that meeting, both Howell and Courville advocated strongly for a waiver of TCL's attorney-client privilege.[79] Moreover, Hunt's notes reflect that Courville became extremely angry during the meeting, demanding to know what TCL attorney Keith Dugger had said: "JC [Courville] Upset - JC starts screaming about how he 'doesn't have a deal' and 'this is his life too,' throwing a fit about how 'he needs to know what Keith Dugger said.'"[80] Hunt's notes reflect that during the meeting, both Courville and Howell became aggressive and threatening:

> BH [Howell] joins in JC's [Courville's] temper tantrum and begins complaining about "bullshit off the record conversations" and is complaining that they (he and JC[Courville]) "want to be a team player" and that "if we (referring to Grisham/Wilburn/DKH/AH/BP [Hagood, Hunt, Poe]) already have our strategy lined out, then they are just going to get up and leave."
> JC [Courville] begins yelling again, along the same lines as before. [81]
>
> JG [Grisham] responds that the reason why there is some hesitancy is that BH/JC [Howell/Courville] went in and talked to the government three times without us knowing. Also, there are two people that got charged in this indictment and that obviously doesn't include JC [Courville].
> BH [Howell] responds: "If you guys fuck this up and get my guy charged, I will slit your throats."

---

[77] *Id.* at 15.
[78] Hunt 10/11/2021 notes.
[79] *Id.* at 1-2.
[80] *Id.* at 2.
[81] *Id.* at 5.

BH [Howell] continues his rant: "How do I know that you're not going to get my guy charged?"
BH [Howell] and JC [Courville] continue screaming about "fucking up the lawyer who is going to testify."[82]

JC [Courville] resumes his temper tantrum. JC states that his sense of frustration is because he "doesn't feel like we have a fucking clue what we're doing," and states "I'm scared to death that there is no strategy."[83]

JC starts yelling again that we should be "giving up Sean McKenna on a silver platter."[84]

In addition to the threats and anger, Courville and Howell continued to advocate strongly that the group take action to force a waiver of the attorney-client privilege, including either seeking an order from the Court or suing TCL attorneys Dugger and/or McKenna.[85] Courville also suggested that Dugger talk to the government.[86]

Following return of the indictment and up until January 26, 2023, Courville and his counsel continued to represent themselves to be members of the JDA, participating in joint defense meetings and calls with Wilburn and Grisham and counsel. In July of 2022, Howell and Courville together called Wilburn directly to urge Wilburn to take a plea, misrepresenting to Wilburn that Poe had approved the call.[87] As late as January 25, 2023, Howell participated in a joint defense conference call in preparation for trial which at that time was still set to commence on February 27, 2023, a month later.

---

[82] *Id.*
[83] *Id.*
[84] *Id.* at 6.
[85] *Id.* at 7, 11-12.
[86] *Id.* at 8.
[87] Poe Declaration at 11-12; Email thread between Poe and Howell, attached as Exhibit Y.

### F. Timeline of Disclosure of Courville's Status as an FBI CHS

On or about January 25 2023, at a social event, Howell surprised Hagood by telling him that sometime in 2021, Courville had signed an agreement with the FBI to be a CHS.[88] Upon learning of Howell's representation regarding Courville's CHS status, Poe drafted and sent a discovery letter to the government on January 26, 2023 seeking files relating to any CHS who had any involvement in the TCL investigation.[89] Ten minutes later, DOJ Trial Attorney Lopez called Poe to ask for clarification regarding the subject of the letter and confirming the identities of CHS 1 and CHS 2 listed in the search warrant affidavit, but still not disclosing Courville's identity as a CHS.[90] On January 30, 2023 – a mere twenty-seven days before trial was set to commence – Lopez called Poe again to inform him that the government would be sending another batch of discovery – it's seventeenth production – containing CHS files relating to Courville.[91]

### III. ARGUMENT AND AUTHORITIES

### A. Law Governing Attorney-Client and Work Product Protections, Joint Defense Agreements and Invasions of the Defense Camp by the Prosecution

The attorney-client privilege is "designed to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *United States v. Robinson*, 121 F.3d 971 (5th Cir. 1997). The privilege protects the communications of individuals with their lawyers, but also protects the communications of corporate principals and employees with counsel:

> The attorney-client privilege attaches to corporations and organizations as well as to individuals. Because corporations can only act through their agents, communications between corporate agents and attorneys are protected if the agent is empowered to act on behalf of the corporation. Thus, the privilege extends not

---

[88] Hagood Declaration at 4.
[89] Poe Declaration at 13. *See also* Email and Discovery letter dated 01/26/23, attached collectively as Exhibit Z.
[90] Poe Declaration at 13-14.
[91] Poe Declaration at 14.

only to communications between officers and directors and the corporation's attorney, but also to communications between a corporation's lower level employees acting at the direction of its officers and the corporation's attorney. *Robinson v. Tex. Auto. Dealers Ass'n*, 214 F.R.D. 432, 440 (E.D. Tex. 2003) (internal punctuation and citations omitted).

In addition to communications, the privilege also protects "items such as research, notes, files and memoranda that are not themselves confidential communications, if disclosure would reveal the substance of any confidential communications between attorney and client that were made in the course of seeking or giving legal advice." *Id.* While the attorney-client privilege protects communications, the work-product doctrine "provides qualified protection of documents and tangible things prepared in anticipation of litigation including a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements." *Id.* (internal punctuation omitted).

"The joint defense privilege is an extension of the attorney-client privilege. It is designed to protect from evidentiary use the confidential information shared among attorneys and multiple criminal defendants who have undertaken a common defense." *FDIC v. Cheng*, Civil No. 3:90-CV-0353-H (Consolidated with CA-3:91-0076-H; CA-3:91-0333-H; CA-3:91-1677-H; CA-3:91-1678-H), 1992 U.S. Dist. LEXIS 20824, at *6 (N.D. Tex. Dec. 2, 1992). *See also, United States v. Hsia*, 81 F. Supp. 2d 7, 16 (D.D.C. 2000); *Crane Sec. Techs., Inc. v. Rolling Optics, AB*, 230 F. Supp. 3d 10, 21-22 (D. Mass. 2017) (noting that communications among parties with a common legal interest are protected even when an attorney is not present). A joint defense agreement need not be in writing -- the exchange of confidential information, the labeling of emails or other shared documents "joint defense," and meeting often to share information pursuant to their common interests are evidence that can prove up the existence of an oral joint defense agreement. *See United States v. Esformes*, No. 16-20549-Cr, 2018 U.S. Dist. LEXIS 193190, at *35 (S.D. Fla. Nov. 13,

2018). The signal purpose of participating in a joint defense agreement is "to preclude joint parties and their attorneys from disclosing confidential information learned as a consequence of the joint defense without permission." *Hsia*, 81 F. Supp. 2d at 16.

It is well settled that "an intrusion by the government upon the confidential relationship between a criminal defendant and his attorney, either through surreptitious electronic means or through an informant, is a violation of the Sixth Amendment right to counsel." *United States v. Zarzour*, 432 F.2d 1, 3 (5th Cir. 1970) (citing *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966)). As such, it is clear that "regardless of who initiates the conversation, the Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1110 (11th Cir. 1990) (Sixth Amendment was violated where prosecutor allowed informant to continue his normal associations in order to obtain incriminating information).

That said, it is worth noting that not all intrusions upon the attorney-client relationship are considered equal. Indeed, numerous courts have found precisely the type of intrusion at issue herein—namely, that where "a member or confidant of the defense team acts effectively as an informant for the government regarding defense preparation and strategies"—to be the most egregious type of all. *United States v. Levy*, No. 10-60159-CR-ZLOCH, 2010 U.S. Dist. LEXIS 68796, at *9 (S.D. Fla. June 22, 2010); *see also United States v. Posner*, 637 F. Supp. 456, 459-60 (S.D. Fla. 1986) (the use of informants to infiltrate the defense camp is just the sort of "glaring government intrusion" that "warrant[s] court intervention.").

Applying the foregoing principles, courts have found that a Sixth Amendment violation occurs "when the government (1) intentionally plants an informer in the defense camp; (2) when

confidential defense strategy information is disclosed to the prosecution by a government informer; or (3) when there is no intentional intrusion or disclosure of confidential defense strategy, but a disclosure by a government informer leads to prejudice to the defendant." *See Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

## B.  Argument

Communications by Wilburn, Grisham, and Courville, with Sean McKenna and attorneys Keith Dugger and Christian Puff of Hall Render are protected by the attorney-client privilege. Moreover, work product prepared by McKenna, Dugger, and Puff in anticipation of litigation is likewise protected. These protections inhere both because Grisham, Wilburn and Courville were parties to joint representation by attorney Sean McKenna and because they were owners of TCL which was represented both by McKenna and the Hall Render attorneys. Furthermore, because Wilburn, Grisham, Courville and counsel were parties to a JDA that commenced in September of 2019 and lasted until Courville's status as a CHS was discovered in January of 2023, communications between the parties to the JDA were protected by the attorney-client privilege, and the attorney work product of JDA counsel is also entitled to protection from disclosure.

The government was aware of the existence of -- and Courville and counsels' participation in -- a joint defense agreement as early as August 26, 2020 when Hagood informed DOJ Trial Attorney Lopez of the JDA's existence and that he would be sharing the substance of his conversation with Lopez with Courville and counsel and Wilburn and counsel. Even after that, as discussed in more detail *supra*, the prosecution team conducted a proffer meeting with Courville and counsel on September 16, 2020 during which the government elicited privileged information from Courville. Then, the government signed Courville up as a CHS on February 11, 2021. While operating as a CHS, at the direction of the government, Courville surreptitiously

recorded telephone and in-person conversations with Ric Speights during which he discussed attorney-client privileged matters and attorney work product. During their recorded in-person meeting, Courville even solicited Speights to call Wilburn rather than texting him, so that the phone conversation would be recorded on the wire.

The government failed to disclose Courville's status as a CHS or to provide the defendants with discovery related to Courville's cooperation until January 30, 2023, a mere month before the scheduled trial. Even then, disclosure was made only in response to Poe's specific written demand of January 26, 2023 for all CHS-related documents and only after DOJ Trial Attorney Lopez initially led Poe to believe that there were only two CHSs involved in the case for whom the defense had already received the appropriate discovery. The prosecution team had full access to all of the Speights-Courville recordings until sometime between January 30, 2023 – the date on which the government provided Courville's CHS materials to the defense in Discovery Production 17 -- and February 17, 2023, when the Filter Team notified counsel for Poe and Hagood by letter that it had identified "Potentially Protected Material" in some of the recordings.[92] There is no evidence that prior to this date, the Filter Team had any involvement in matters relating to Courville's cooperation.

## C. <u>Request for Evidentiary Hearing and Discovery</u>

In addition to the above *known* disclosures of privileged and work product-protected information, Wilburn and Grisham are deeply concerned about disclosures as yet unknown resulting from the government's intrusion into their attorney-client relationships by virtue of Courville's continued substantive participation in the JDA while simultaneously operating as a CHS for the FBI in its ongoing investigation of TCL. As discussed *supra*, Courville and counsel

---

[92] Filter Team Letter dated February 17, 2023.

were copied on every joint defense communication and participated in numerous joint defense calls and meetings between February 11, 2021 and January 26, 2023. Courville and counsel engaged substantively with other JDA members regarding important issues of strategy, advocating strongly for various positions – including, for example, waiving the attorney-client privilege as to advice rendered by McKenna and Hall Render attorneys – that would benefit the government. Even after indictment, during joint defense strategy meetings, Courville and counsel demanded to know the details of Wilburn and Grisham's planned defenses. Courville and Howell together called Wilburn in contravention of Poe's instructions and tried to persuade him to take a plea.

Other than the three reports of investigation for Courville's three proffer sessions, his CHS agreement, and an Investigation Documentation Form reflecting the procedure followed and chain of custody for the recordings made of Courville and Speights' in-person meeting,[93] the defense has been provided with no other government reports relating to Courville's cooperation. Although the Investigation Documentation Form states, "Sergeant Wood will prepare a separate report summarizing the recorded conversation between Speights and the cooperating source,"[94] no such report has been provided. It seems highly unlikely that Courville became an FBI CHS and then neither he nor his counsel ever spoke with any member of the government again about any substantive matter relating to the TCL case.

In light of the deceptive continued participation in the JDA by Courville and counsel after signing the CHS agreement, the vigorous advocacy by Courville and counsel of positions that would benefit the government, the aggressive attempts by Courville and counsel to learn the

---

[93] Investigation Documentation Form, attached as Exhibit AA.
[94] *Id*. at 2.

defense trial strategy, and the government's concealment of Courville's status as a CHS until the eleventh hour and only upon specific demand, Wilburn and Grisham respectfully request an evidentiary hearing. The purpose of such a hearing would be to determine what privileged or otherwise confidential information has been shared with the government beyond the disclosures of which the defense is already aware, as well as to determine what use has been made by the government of the disclosures. *See Shillinger v. Haworth*, 70 F.3d 1132, 1143 (10th Cir. 1995) (citing *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745 (1963)) ("Given the inadequacy of the state court factfinding procedures in this case, we have serious concerns about the extent of the prosecutor's intrusion. ... [W]e remand the case to the district court for factfinding procedures to determine the extent of the intrusion."); *Ayers v. Hudson*, 623 F.3d 301, 311 (6th Cir. 2010) (Finding that when addressing alleged intrusions into the defense camp, courts must "analyze the facts and circumstances of a particular case"); *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir. 1996) (holding that a defendant is entitled to a hearing where the defendant's moving papers "demonstrate a colorable claim for relief ... [by raising] issues of fact material to the resolution of the defendant's constitutional claim."); *United States v. Brink*, 39 F.3d 419, 422–24 (3d Cir. 1994) (directing trial court to conduct evidentiary hearing where defendant raised colorable claim that government violated constitutional right to counsel). Potential witnesses at that evidentiary hearing would include Courville, Howell, and Meyer as well as members of the prosecution team, including DOJ Trial Attorney Lopez. Only by determining the scope of the intrusion as well as the use made by the government of the privileged and/or confidential information that has been disclosed can the defense evaluate the harm and determine what remedy to seek.[95]

---

[95] Depending on the results of the evidentiary hearing, requested relief may include remedies ranging from exclusion of certain evidence or categories of evidence, to disqualification of all or part of the trial team, up to and including dismissal of the indictment.

In addition to an evidentiary hearing, the defense seeks an order from the Court compelling the government to provide the following to the defense for its use in preparing for the evidentiary hearing and assessing the potential scope of the intrusion:

- Any existing reports of investigation, whether in final or draft form, for meetings or calls with Courville and/or his counsel;

- Copies of any and all notes, taken by any member of the prosecution team or member of a cooperating organization or agency or by Courville or his counsel, whether typed or handwritten (including drafts), for meetings or calls between Courville or his counsel and any member of the prosecution team or member of a cooperating organization or agency;

- Copies of any and all texts and emails between Courville and/or his counsel and any member of the prosecution team or member of a cooperating organization or agency;

- Telephone records for Howell, Meyer, and/or Courville reflecting calls or texts to or from DOJ Trial Attorney Lopez's office line or cellphone number or Sergeant Wood's office line or cellphone number or SA Susanna Shaw's office line or cellphone number between February 11, 2023 and January 30, 2023.

## IV. CONCLUSION

For all of the above reasons, the defendants respectfully request an order by this Court setting this matter for an evidentiary hearing and mandating that the government submit the above materials to the defense in anticipation of that hearing.

Respectfully submitted,

*/s/Marlo P. Cadeddu*
MARLO P. CADEDDU
Texas Bar Card No. 24028839
**Law Office of Marlo P. Cadeddu, P.C.**
2911 Turtle Creek Blvd.
Suite 300 - #390
Dallas, Texas 75219
Telephone: 214.220.9000
mc@marlocadeddu.com
Counsel for Defendants
Wilburn and Grisham

## CERTIFICATES OF CONFERENCE AND SERVICE

I hereby certify that on the 11th day of April, 2023, a true and correct copy of the above and foregoing document was filed electronically with the Clerk of the U.S. District Court for the Northern District of Texas. This document and attachments reference and contain attorney-client privileged and work product-protected materials. Accordingly, I have not conferred with the government and this pleading and attachments are being filed *ex parte* and under seal. I await the Court's instructions regarding providing copies to the Filter Team.

*/s/Marlo P. Cadeddu*
MARLO P. CADEDDU